**THOMAS P. SMITH, JR.**
**Sandeep Satwalekar**
**Christopher J. Dunnigan**
**Karen M. Lee**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**(212) 336-0061 (Dunnigan)**
**dunnigancj@sec.gov**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| **Plaintiff,** | **26-cv-00632** |
| **-against-** | |
| **JOEL B. SOFIA,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiff Securities and Exchange Commission ("Commission"), 100 Pearl Street, Suite 20-100, New York, NY 10004-2616, for its Complaint against Defendant Joel B. Sofia ("Sofia" or "Defendant"), last known to be residing at 357 Chapel Heights Road, Sewell, NJ 08080-1871, alleges as follows:

### SUMMARY OF ALLEGATIONS

1.      From at least July 2019 to January 2023 (the "Relevant Period"), Sofia, an investment adviser, made material misrepresentations to at least three advisory clients (the "Clients"). In soliciting the Clients, Sofia lied about his professional background and experience in the financial industry, falsely guaranteed that the Clients would not lose money, and deceived

at least two Clients regarding his purported development and use of proprietary trading software.

2.      Sofia charged the Clients fees to manage their investments. He convinced the Clients to provide him with direct access to their brokerage accounts so that he could place trades on their behalf. He told at least one of the Clients that there was nothing illegal with giving him such access, while failing to disclose that the broker-dealer at issue did not permit independent advisers to trade in client accounts.

3.      By making materially false and misleading statements to the Clients, Sofia breached his fiduciary obligations as an investment adviser.

4.      Sofia's trading of options in the Clients' accounts resulted in losses to the Clients of between 61% and 89% of their beginning account balances. By January 2023, Sofia's fraud had caused the Clients to lose a total of more than $1.6 million. After the Clients expressed concerns to Sofia about their respective losses, Sofia stopped communicating with them.

## VIOLATIONS

5.      By virtue of the foregoing conduct and as alleged further herein, Sofia violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) & 80b-6(2)].

6.      Unless Sofia is restrained or enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions and courses of business of similar type and object in the future.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.      The Commission brings this action pursuant to the authority conferred upon it by Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) & 80b-9(e)].

8.      The Commission seeks a final judgment: (a) permanently enjoining Sofia from

violating the federal securities laws this Complaint alleges he has violated; (b) permanently enjoining Sofia from acting as or being associated with any investment adviser, broker, or dealer; and (c) ordering Sofia to pay a civil monetary penalty pursuant to Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)].

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Advisers Act Section 214 [15 U.S.C. § 80b-14].

10.     Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

11.     Venue lies in this District under Advisers Act Section 214 [15 U.S.C. § 80b-14]. Defendant may be found in, is an inhabitant of, or transacts business in the District of New Jersey, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. For example, Sofia resided in this District while acting as an investment adviser to the Clients and making the misrepresentations alleged herein.

## DEFENDANT

12.     Sofia, age 46, was, at all relevant times, a resident of Sewell, New Jersey. He has never been registered with the Commission or in any capacity. In 2003, the Commodities Futures Trading Commission ("CFTC") charged Sofia with operating as an associated person of a commodity pool operator without registering with the CFTC. On June 21, 2005, Sofia consented to the entry of a final judgment permanently enjoining him from: (i) future violations of Commodity Exchange Act Section 4k(2) [7 U.S.C. § 6k(2)]; (ii) from engaging in any commodity futures or options related activity; (iii) ordering disgorgement of $25,162.50; and (iv)

ordering a civil monetary penalty of $10,000.00. *CFTC v. Marquis Fin. Mgmt. Sys., et al.*, 03-cv-74206 (E.D. Mich.) (LPZ).

## FACTS

A.    <u>Background on Investment Advisers</u>

13.    An investment adviser, under the Advisers Act, includes any person who, for compensation, engages in the business of advising others about investing in securities or the value of securities.

14.    An investment adviser, under the Advisers Act, includes individuals who exercise control over what purchases and sales are made with their clients' funds.

15.    An investment adviser owes a fiduciary duty to clients. This duty includes an affirmative duty of utmost good faith and a duty to act in the best interest of clients, as well as an obligation to provide full and fair disclosure of all material facts and to employ reasonable care to avoid misleading clients.

16.    By charging fees to the Clients in return for directly managing the investments in their brokerage accounts, including trading options, Sofia acted as an investment adviser and thereby owed the Clients a fiduciary duty.

B.    <u>Client-A</u>

17.    In 2018, Client-A, a resident of the Netherlands, met Sofia in a Facebook group for day traders and people interested in learning how to trade.

18.    Sofia invited Client-A to join an online class on how to trade options that Sofia offered over Slack, a digital workspace and messaging platform.

19.    Client-A subscribed to Sofia's online class, paying $1,500 for ten lessons.

20.    In or around July 2019, Sofia offered to manage trades in Client-A's brokerage

account at a broker-dealer ("Broker-1") using what Sofia described as his proprietary options trading system.

21.    Sofia provided Client-A an "Investment Partnership Agreement" ("Agreement") pursuant to which "WOLO Wealth Inc." ("WOLO"), would be responsible for trading in Client-A's brokerage account in return for 20% of the trading profits, calculated monthly.

22.    Despite a name suggesting that it was an incorporated entity, WOLO was not actually a corporation, but was simply a name under which Sofia conducted his advisory business.

23.    Under the Agreement, trading losses were to be borne solely by Client-A.

24.    The Agreement claimed that WOLO was not an investment adviser or broker-dealer but stated that the purpose of the partnership was for WOLO to invest the assets of Client-A's brokerage account in "stocks, securities and options on stocks and securities."

25.    Sofia made a number of misrepresentations to convince Client-A to execute the Agreement and allow Sofia to manage Client-A's investments by trading in Client-A's account.

26.    For example, electronic messages, Sofia stated to Client-A, in substance, that he previously had a successful career as an options trader, including at a registered broker-dealer, and that he wanted to share the knowledge he had accumulated with other people to allow them to be financially free.

27.    Sofia further stated to Client-A that, based on his decades of experience as a successful options trader at a registered broker-dealer, he had developed a proprietary trading system.

28.    Client-A further understood from the communications with Sofia that he had held a securities license and worked in the securities industry.

29.     Sofia never held any securities licenses and was never associated with a broker-dealer.

30.     As Sofia knew or recklessly disregarded, the statements described in paragraphs 26-29 above were false and misleading because Sofia had never been employed as an options trader at a registered broker-dealer.

31.     Sofia also claimed in Slack messages with Client-A that there was no risk associated with his trading method and that he guaranteed success.

32.     Sofia knew or recklessly disregarded that this was false.

33.     As the Agreement that Sofia provided to Client-A acknowledged, "[a]n investor could potentially lose all or more of the initial investment." However, Sofia falsely assured Client-A that this was merely standard contractual language and that Sofia's management of Client-A's brokerage account would be risk-free.

34.     Client-A would not have engaged Sofia to manage her investments had she known the falsity of Sofia's representations.

35.     When Sofia first obtained access to Client-A's brokerage account at Broker-1 in July 2019, the account balance was $100,241.98.

36.     Between July 2019 and February 2020 (when Client-A took back control of her brokerage account), Sofia placed approximately 3,710 options trades in Client-A's account.

37.     During that period, Sofia's trading caused Client-A's account to lose more than 60% of its value.

38.     In response to questions by Client-A in January 2020 regarding the trading losses, Sofia initially stated his methods were perfect and that he would get Client-A's money back within two years.

39.     But by February 2020, Sofia stopped responding to messages from Client-A and blocked Client-A on Slack.

C.      Client-B

40.     Client-B, who resided at all relevant times in San Leandro, California and now resides in London, England, was introduced to Sofia in approximately January 2021 through Client-B's brother, who was a subscriber to Sofia's online classes on trading options.

41.     In a telephone conversation with Client-B, Sofia represented that he had over 20-years' experience trading options, including at a bank, which Client-B understood to refer to professional experience as a licensed trader with a registered broker-dealer.

42.     As Sofia knew or recklessly disregarded, his representation to Client-B regarding his trading experience was false or misleading because Sofia did not hold any securities licenses and had never been associated with a registered broker-dealer.

43.     During their telephone conversation and in follow-up communications with Client-B, Sofia guaranteed that Client-B would earn double digit returns and would never lose his capital if Client-B funded an account at a certain brokerage firm ("Broker-2") and gave Sofia access to the account to place trades on Client-B's behalf.

44.     Sofia knew or recklessly disregarded that such guarantees were false because, among other things, by the time Sofia solicited Client-B's advisory business in 2021, Sofia's trading had already caused substantial losses to Client-A, as discussed above.

45.     During their communications, Sofia represented to Client-B, that Sofia used his own proprietary AI software that fully automated the trading process and always captured the upside while completely eliminating the downside.

46.     These representations were false and misleading.

47.     For example, as Sofia knew or recklessly disregarded, including by virtue of the trading losses he previously caused in Client-A's account, whatever software (if any) Sofia used did not always capture the upside and completely eliminate the downside.

48.     Additionally, trades in accounts at Broker-2 could only be placed using Broker-2's own software or that of third parties with which Broker-2 contracted (which did not include Sofia's purported software).

49.     In January 2021, Client-B funded an account at Broker-2 and gave Sofia access to the account so that Sofia could place trades on Client-B's behalf.

50.     Client-B paid Sofia a flat fee of $2,130 to trade in the account on Client-B's behalf.

51.     Client-B would not have engaged Sofia to manage his investments had he known the falsity of Sofia's representations to him.

52.     At the time Sofia obtained access to Client-B's brokerage account, the balance in the account was approximately $1.2 million.

53.     Between January 2021 and November 2022, Sofia placed approximately 2,100 options trades in Client-B's account.

54.     Contrary to Sofia's representations to Client-B, Sofia's trades in Client-B's account were not placed using Sofia's purported proprietary AI software.

55.     From July 2021 onward, Client-B's account consistently declined in value as a result of Sofia's trades.

56.     As Client-B's losses mounted, Client-B asked Sofia for answers as to why his account was incurring losses. Sofia blamed him and said it was because Client-B didn't follow Sofia's rules. Sofia then stated it would take 3-6 months to make back the losses.

57. By the time Client-B regained control over his account in November 2022, the account had declined in value by approximately 89%, and Client-B had lost more than $1 million as a result of Sofia's trading.

58. Client-B continued to seek answers from Sofia as to what had happened and how Sofia planned to make him whole. In February 2023, Sofia stated it would take 6-12 months to make back the losses, but in early 2024, Sofia stopped responding to Client-B altogether.

D. <u>Client-C</u>

59. Client-C, a resident of San Francisco, California, was introduced to Sofia in or around October 2021 through Client-B.

60. In conversations with Client-C, Sofia stated that he had developed a proprietary automated system for options trading that eliminated the downside risk.

61. Sofia told Client-C that this system was based on Sofia's more than three decades of professional trading experience.

62. Sofia explained to Client-C that he could manage Client-C's money in return for an annual subscription fee.

63. Sofia instructed Client-C to move his investment funds to Broker-2 so that Sofia could use his proprietary automated system to place trades. Sofia claimed that, because this system eliminated the downside risk of trading, Sofia could achieve performance results for his clients that they could not obtain elsewhere.

64. Sofia's representations to Client-C were false and misleading because, as Sofia knew or recklessly disregarded, his trading methodology did not eliminate the risk, as it had already resulted in substantial losses in Client-A's and Client-B's accounts.

65. In fact, by the time Sofia started trading in Client-C's account in November 2021,

Sofia had already caused hundreds of thousands of dollars of losses, in total, to Client-A and Client-B.

66.     Additionally, contrary to Sofia's representations to Client-C about using his proprietary automated system to place trades in Client-C's account at Broker-2, trades at Broker-2 could only be placed at using Broker-2's software or the software of third parties with which Broker-2 contracted (which did not include Sofia or WOLO).

67.     Client-C would not have engaged Sofia to manage his investments had he known the falsity of Sofia's representations.

68.     Additionally, in response to questions from Client-C regarding the legality of Sofia directly accessing and placing trades in Client-C's account, Sofia told Client-C that the arrangement was not illegal, while failing to disclose that Broker-2 prohibited investment advisers, such as Sophia, from trading in their clients' self-directed accounts.

69.     From November 2021 to January 2022, Client-C paid Sofia $2,773 in fees for Sofia to manage the investments in Client-C's account.

70.     When Sofia first obtained access to Client-C's brokerage account in November 2021, the beginning balance was $956,489.98.

71.     Between November 2021 and January 2023, Sofia placed approximately 5,622 options trades in Client-C's account.

72.     From approximately April 2022 onward, Client-C's account consistently declined in value as a result of Sofia's trades.

73.     Beginning in or around June 2022, Client-C sought answers from Sofia regarding his account's performance. At first, Sofia responded that the results were Client-C's responsibility.

74.     Sofia later refused to speak with Client-C unless Client-C paid Sofia an additional fee, which Client-C declined to do.

75.     By the time Client-C regained control over his account in January 2023, it had declined in value by approximately 60%, resulting in approximately $500,000 in losses.

## FIRST CLAIM FOR RELIEF
### Violations of Advisers Act Sections 206(1) and (2)

76.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 75.

77.     At all relevant times, Sofia was an investment adviser under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)]. As an investment adviser, Sofia owed the Clients a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure of all material facts, as well as a duty to act in their best interests.

78.     By engaging in the acts and conduct described in this Complaint, Sofia, while acting as an investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, has: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engage in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

79.     By reason of the foregoing, Sofia, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final

Judgment:

## I.

Permanently enjoining Sofia and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)];

## II.

Permanently enjoining Sofia from, directly or indirectly, acting as or being associated with any investment adviser, broker, or dealer;

## III.

Ordering Sofia to pay a civil monetary penalty under Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and

## IV.

Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
January 20, 2026

*Christopher J. Dunnigan*

Thomas P. Smith, Jr.
Sandeep Satwalekar
Christopher J. Dunnigan
Karen M. Lee
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
T: (212) 336-0061 (Dunnigan)
Email: dunnigancj@sec.gov

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged against the

Defendant in the foregoing Complaint is not the subject of any other civil action pending in any

court, or of any pending arbitration or administrative proceeding.

*Christopher J. Dunnigan*
CHRISTOPHER J. DUNNIGAN
Attorney for Plaintiff
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-0061 (Dunnigan)
Email:  dunnigancj@sec.gov

Of Counsel:
Thomas P. Smith, Jr.
Sandeep Satwalekar
Karen M. Lee

14

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Civil Rule 101.1(f), the undersigned hereby designates the United

States Attorney's Office for the District of New Jersey to receive service of all notices or papers

in this action at the following address:

John Basiak
United States Attorney's Office
Chief, Civil Division
District of New Jersey
970 Broad Street, Suite 700
Newark, NJ 07102

SECURITIES AND EXCHANGE COMMISSION

*Christopher J. Dunnigan*

CHRISTOPHER J. DUNNIGAN
Attorney for Plaintiff
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-0061(Dunnigan)
dunnigancj@sec.gov

Of Counsel:
Thomas P. Smith, Jr.
Sandeep Satwalekar
Karen M. Lee

15